**[Cite as *State v. Wright*, 2011-Ohio-4874.]**

.

## IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 24276 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2010-CR-156 |
| v. | : | |
| | : | (Criminal Appeal from |
| STEFAUN D. WRIGHT | : | Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of September, 2011.

. . . . . . . . .

MATHIAS H. HECK, JR., by JOHNNA M. SHIA, Atty. Reg. #0067685, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorneys for Plaintiff-Appellee

DAVID R. MILES, Atty. Reg. #0013841, 125 West Main Street, Suite 201, Fairborn, Ohio 45324
      Attorney for Defendant-Appellant

. . . . . . . . .

CANNON, J., sitting by assignment.

{¶ 1} This matter is submitted to this court on the record and the briefs of the parties.

Appellant, Stefaun D. Wright, appeals the judgment entered by the Montgomery County

Court of Common Pleas.  The trial court sentenced Wright to an aggregate prison term of six years for his convictions for aggravated burglary, robbery, theft, and aggravated menacing.

{¶ 2}  On the morning of October 31, 2009, Gene Smith was in her residence in Dayton, Ohio.  At that time, her husband, Sam Smith, was not home.  When Gene Smith was in her upstairs bedroom, she noticed an individual running away from her garage.  Then, she witnessed the same individual running toward her home.  A few minutes later, Gene Smith went downstairs to the main level of her home.  While still on the stairs, she saw two individuals in her home, one of the individuals being the same person she had seen running outside her home.  In court, Gene Smith identified this individual as Wright.  She recognized the second individual as "Duke," whom the Smiths had hired to perform miscellaneous jobs around their home.

{¶ 3}  Gene Smith testified that Wright grabbed her and pulled her into the kitchen.  Wright pushed Gene Smith's head into the wall several times.  Then, Wright ordered her to get on her knees, and he told her not to move or he would kill her.  During this time, Wright was holding an object to Gene Smith's neck, which she believed to be a gun.

{¶ 4}  Wright and Duke briefly moved away from Gene Smith, and she was able to escape out a side door.  She ran to a neighbor's house and called 911.  Duke and Wright remained in her home.  Upon later inspection, the Smiths noticed that several gems, jewelry, tools, a bomber jacket, and approximately $260 in cash were missing from their home.

{¶ 5}  Willie Knox-Little was walking home on the morning in question.  He noticed two individuals running from the Smiths' home.  He recognized one of the individuals as Duke.  A second individual was wearing a hooded sweatshirt and carrying a red towel in his

arms like a running back would carry a football. Knox-Little recognized the second person, but could not immediately remember his name. He subsequently remembered that it was a red-headed youth from the neighborhood, and later, Knox-Little identified Wright as the second person he saw running from the Smiths' home.

{¶ 6} Wright was transported to the police station to be questioned by Detective Krista Gorsuch. During that time, Detective Gorsuch took a digital photograph of Wright. The detective assembled a photo array using the photographs of Wright and five other individuals. She photocopied the photo array, making it a black and white image, so as to reduce the possible prejudice to Wright, who is a black male with distinctive red hair.

{¶ 7} Detective Gorsuch took the photo array to the Smiths' home, where she individually presented it to Gene Smith and Willie Knox-Little. Gene Smith did not make an identification from the photo array. In court, she explained that all of the individuals in the photo array "looked like *** Black men. And the person that I saw to me was not a Black person." Further, Gene Smith described Wright's complexion as "a lot lighter" with a pale face. Knox-Little selected Wright's photograph from the array as one of the individuals he saw running from the Smiths' house.

{¶ 8} Detective Gorsuch returned to the police station and placed Wright under arrest. Wright was taken to a booking area, where Officer Jill Saunders worked. When processing the crimes, she asked Detective Gorsuch what was taken from the Smiths' home, to which the detective replied, "some loose gems." At that time, Wright blurted out, "Duke told me they were diamonds."

{¶ 9} Wright was originally charged in the Juvenile Division of the Montgomery

County Court of Common Pleas. However, the matter was subsequently transferred to the general division of the common pleas court.

{¶ 10} Wright was indicted on several counts, including: one count of aggravated burglary, in violation of R.C. 2911.11(A)(1); one count of robbery, in violation of R.C. 2911.02(A)(2); one count of grand theft, in violation of R.C. 2913.02(A)(1); and one count of aggravated menacing, in violation of R.C. 2903.21(A). Wright pled not guilty to the charged offenses.

{¶ 11} Wright filed a motion to suppress his pretrial statements to the police. In addition, he filed a motion to suppress any pretrial identifications. The trial court overruled both of Wright's motions to suppress. In addition, Wright filed a notice of alibi asserting that he was at a residence on Yellowstone Avenue at the time of the crimes.

{¶ 12} A jury trial was held. The Smiths, Officer Jeffery Watkins, Officer Saunders, Detective Gorsuch, and Knox-Little testified for the state in its case-in-chief. Wright called Corinthia McShann and Sabrina Jordan as alibi witnesses. Thereafter, the state called Sergeant Tom Flanders of the Montgomery County Sherriff's Office and Detective Gorsuch as rebuttal witnesses.

{¶ 13} The jury found Wright guilty of aggravated burglary, robbery, and aggravating menacing. The jury found Wright not guilty of grand theft but, instead, guilty of theft as a result of its finding that the value of the property stolen was $500 or more, but less than $5,000.

{¶ 14} The trial court sentenced Wright to a four-year prison term for his aggravated burglary conviction, a two-year term for his robbery conviction, and a one-year prison term for

his theft conviction. The trial court ordered the sentences for counts one and two to be served consecutively to each other. The court ordered the sentence imposed for count three to be served concurrently to the sentences for counts one and two. Thus, the aggregate prison term for counts one, two, and three was six years. In addition, the trial court imposed a 60-day jail term for Wright's aggravated menacing conviction, for which the trial court gave Wright credit for time served.

{¶ 15} Wright timely appealed the trial court's judgment to this court. Wright raises five assignments of error. His first assignment of error is:

{¶ 16} "THE TRIAL COURT ERRED IN NOT SUPPRESSING THE PHOTO ARRAY IDENTIFICATION EVIDENCE IN VIOLATION OF APPELLANT'S DUE PROCESS RIGHTS UNDER ARTICLE 1, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION."

{¶ 17} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶8. The appellate court must accept the trial court's factual findings, provided they are supported by competent, credible evidence. Id., citing *State v. Fanning* (1982), 1 Ohio St.3d 19. Thereafter, the appellate court must independently determine whether those factual findings meet the requisite legal standard. Id., citing *State v. McNamara* (1997), 124 Ohio App.3d 706.

{¶ 18} Wright challenges the trial court's failure to suppress Knox-Little's identification from the photo array presented to him. Knox-Little identified Wright as the individual he saw running from the Smiths' residence on the day in question.

**{¶ 19}** "'When a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt *and* the identification was unreliable under all the circumstances.'" *State v. Murphy*, 91 Ohio St.3d 516, 534, 2001-Ohio-112, quoting *State v. Waddy* (1992), 63 Ohio St.3d 424, 438.

**{¶ 20}** Wright argues the photo array was unduly suggestive. He claims the photo array should have included pictures of individuals with features similar to his, specifically individuals who had a "like complexion and red hair." In a case involving the legitimacy of a photo array, the Supreme Court of Ohio held, "'[a] defendant in a lineup need not be surrounded by people nearly identical in appearance.'" *State v. Murphy*, 91 Ohio St.3d at 534, quoting *State v. Davis*, 76 Ohio St.3d 107, 112, 1996-Ohio-414. In this matter, Detective Gorsuch testified at the suppression hearing that she could not find a sufficient number of pictures of young black males with red hair. To minimize potential prejudice due to Wright's hair color, detective Gorsuch made black and white photocopies of the photo array. In the photo array shown to the witnesses, Wright's hair color appeared dark, without any red tint.

**{¶ 21}** The trial court found the photo array was not unduly suggestive. After reviewing the record, we conclude the trial court's findings are supported by competent, credible evidence.

**{¶ 22}** Wright challenges Knox-Little's identification on the ground that it is unreliable under the circumstances. Wright claims that Knox-Little observed the suspect "from a long distance for a short period of time." Prior to viewing the photo array,

Knox-Little told Detective Gorsuch that he recognized the individual running from the Smiths' home as someone from the neighborhood, although he did not know the individual by name. The fact that Knox-Little had previously seen the suspect decreases the likelihood that his identification was unreliable. Also, it is worth noting that Knox-Little referred to the suspect as the "redheaded kid that lives in the neighborhood." The fact that he identified Wright in this manner, even though the suspect was wearing a hooded sweatshirt when he ran from the house and Wright's photograph in the array was not in color, is significant. This demonstrates that Knox-Little's identification of Wright as the suspect was based on things other than the color of his hair, such as his facial features.

{¶ 23} The trial court concluded that Knox-Little's identification was not unreliable. This conclusion is supported by the record.

{¶ 24} The trial court did not err in denying Wright's motion to suppress the evidence related to the identification.

{¶ 25} Wright's first assignment of error is without merit.

{¶ 26} Wright's second assignment of error is:

{¶ 27} "THE TRIAL COURT ERRED IN PERMITTING IMPROPER REBUTTAL TESTIMONY WHICH VIOLATED APPELLANT'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL."

{¶ 28} Wright acknowledges that portions of the record are "indiscernible" regarding this assignment of error. Significant portions of the sidebar conference on the issue of admissibility of the rebuttal evidence were not transcribed. We note that Wright did not attempt to correct the record pursuant to App.R. 9(E). However, despite this failure, we will

address this assigned error on its merits. This is because, after a review of the transcript, it is clear that all of the witnesses' testimony is properly transcribed.

**{¶ 29}** The decision to allow rebuttal testimony is left to the trial court's discretion. *State v. McNeill*, 83 Ohio St.3d 438, 446, 1998-Ohio-293 (citations omitted). An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, Clark App. No. 09-CA-54, 2010-Ohio-1900, at ¶62, quoting Black's Law Dictionary (8 Ed.Rev.2004) 11.

**{¶ 30}** Rebuttal evidence is offered to "explain, refute, or disprove" the adverse party's evidence, and is limited to that purpose. *State v. McNeill*, 83 Ohio St.3d at 446 (citation omitted).

**{¶ 31}** In this matter, Wright called two alibi witnesses, Corinthia McShann and Sabrina Jordan. McShann and Jordan are the sister and mother, respectively, of Wright's friend Jamarco McShann. McShann testified that Wright was asleep at Jordan's home on the morning of Beggar's Night. Further, she testified that Beggar's Night was on Saturday, October 30, 2009, and Halloween was on Sunday, October 31, 2009. Alternatively, Jordan testified that Wright was asleep at her home on Saturday, October 31, 2009, which she testified was the morning after Beggar's Night, when the children went trick-or-treating.

**{¶ 32}** In addition, Jordan testified that she read a portion of a discovery packet regarding Wright's case approximately three months prior to trial. She testified that the discovery packet was sent to her home for Jamarco.

**{¶ 33}** On rebuttal, the state called Sergeant Flanders and Detective Gorsuch. There were two primary issues for rebuttal—one, the day of the week that Halloween and Beggars'

Night fell in 2009 and, two, whether Wright sent a discovery packet to the alibi witnesses.

{¶ 34} Sergeant Flanders and Detective Gorsuch testified regarding a recorded phone conversation between Wright and a female. During the phone call, Wright tells the other person that Jordan knew that the incident in question happened on Halloween because he sent her a discovery packet. Detective Gorsuch identified Wright's voice and testified to the contents of a typical discovery packet. In addition, Detective Gorsuch testified that Beggars' Night occurred on Saturday, October 31, 2009, during the hours of 6:00 to 8:00 p.m.

{¶ 35} In support of his argument, Wright cites this court's decision in *State v. Hawn* (2000), 138 Ohio App.3d 449. *Hawn* was a murder case, where the state presented a firearms expert to provide testimony that the gunshot wound was not self-inflicted, since the gun was fired at a distance of at least five feet. Id. at 468. Then, the defense presented two expert witnesses, who opined that the gunshot wound was inflicted at close range. Id. at 469. On rebuttal, the state presented another firearms expert, who extensively testified, with the aid of a photographic exhibit not previously disclosed to the defense, regarding gun-shot residue. Id. at 469-470. In concluding the trial court erred by admitting the rebuttal evidence, this court held the evidence "clearly crossed the line of proper rebuttal testimony and became a mere rehashing of evidence already presented during the state's case-in-chief." Id. at 470.

{¶ 36} In the case sub judice, the state presented rebuttal evidence solely on the issue of Wright's alibi witnesses. This evidence was presented to contradict the evidence presented by the alibi witnesses. First, Detective Gorsuch's testimony regarding the discovery packet sent by Wright to the home of the alibi witnesses provides an alternative explanation for their testimony. Specifically, this evidence creates the inference that Jordan

knew what day to testify that Wright was at her home because she read the discovery packet.

{¶ 37} In addition, there was confusion regarding the date and day of the week that Beggars' Night fell. McShann testified that Beggars' Night occurs on the day before Halloween. Also, she testified that Beggars' Night occurred on Saturday, October 30, 2009. Detective Gorsuch offered rebuttal testimony that October 31, 2009, fell on a Saturday. In addition, her rebuttal testimony was that Beggars' Night actually occurred on October 31, 2009.

{¶ 38} The record does not establish that the trial court abused its discretion by permitting the state to offer rebuttal evidence.

{¶ 39} Wright's second assignment of error is without merit.

{¶ 40} Wright's third assignment of error is:

{¶ 41} "THE MANIFEST WEIGHT OF THE EVIDENCE DOES NOT SUPPORT APPELLANT'S CONVICTION FOR AGGRAVATED BURGLARY, ROBBERY, GRAND THEFT AND AGGRAVATED MENACING."

{¶ 42} We initially note that reference to "grand theft" in this assignment of error and in the trial court's entry of April 20, 2010, is apparently a reference to Wright's conviction of theft, in violation of R.C. 2913.02(A)(2). We will treat it accordingly.

{¶ 43} In determining whether a verdict is against the manifest weight of the evidence, the Supreme Court of Ohio has adopted the following language as a guide:

{¶ 44} " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest

miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52 (citations omitted).

**{¶ 45}** On appeal, the only issue raised by Wright in relation to his manifest weight of the evidence argument is his identity as the perpetrator.

**{¶ 46}** In this matter, Gene Smith identified Wright as the perpetrator in court. Gene Smith was not able to select Wright's photograph from the photo array presented to her. However, she explained her inability by testifying that all the men in the photo array had dark complexions, but Wright has a lighter complexion and a pale face. Also, Gene Smith recognized the second person in her home as "Duke," whom the Smiths had hired to perform odd jobs around the house.

**{¶ 47}** Sam Smith testified that Duke would often come to his home to talk. During these times, he would offer Duke food. On occasion, Wright, who was a friend of Duke's, would also come over. Sam Smith testified that he knew Wright as "Red."

**{¶ 48}** Knox-Little testified that he recognized Wright running from the Smiths' home on the morning in question. While he could not remember Wright's name at that time, a short while later he realized the person he saw was the "boy with the red hair." Subsequently, he later picked Wright's photograph out of the photo array. Finally, in court, Knox-Little identified Wright as the person he saw running from the Smiths' house carrying a towel.

**{¶ 49}** Officer Jill Saunders testified for the state. She participated in processing

Wright at the police station. When she was typing the charges, she asked Detective Gorsuch what was taken in the underlying crime, to which Detective Gorsuch responded, "some loose gems." At that point, Wright stated, "Duke told me they were diamonds."

**{¶ 50}** Wright argues that he could not have committed the offenses because his alibi witnesses testified he was sleeping at Jordan's home at the time of the offenses. The weight to be given to the evidence and the credibility of witnesses are primarily matters for the jury to decide. *State v. DeHass* (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. "Also, in assessing the witnesses' credibility, the jury, as the trier-of-fact, had the opportunity to observe the witnesses' demeanor, body language, and voice inflections." *State v. Valentin*, Portage App. No. 2009-P-0010, 2009-Ohio-6038, at ¶47 (citation omitted). "Thus, the jury was 'clearly in a much better position to evaluate the credibility of witnesses than (this) court.' " Id. (Citation omitted.) Wright's alibi witnesses were family members of his close friend, Jamarco McShann. Thus, there is a potential the witnesses were biased. Further, there was a significant amount of confusion in the alibi witnesses' testimony regarding the exact morning they claimed Wright was sleeping at Jordan's home.

**{¶ 51}** Upon review of the record, we do not consider this to be a case in which the jury clearly lost its way or created a manifest miscarriage of justice. The jury's verdicts are not against the manifest weight of the evidence.

**{¶ 52}** Wright's third assignment of error is without merit.

**{¶ 53}** Wright's fourth assignment of error is:

**{¶ 54}** "THE TRIAL COURT ERRED IN SENTENCING APPELLANT TO [A] CUMULATIVE TERM OF SIX YEARS."

**{¶ 55}** We note significant portions of the sentencing transcript are "indiscernible," and that no objection regarding allied offenses appears in the transcript. However, the "imposition of multiple sentences for allied offenses of similar import is plain error." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, at ¶31, citing *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, at ¶96-102. Thus, we will address this assigned error on its merits.

**{¶ 56}** Wright does not allege his conviction for aggravated menacing is an allied offense of similar import with any of the other offenses of which he was convicted. Accordingly, we will not conduct an analysis of the aggravated menacing offense.

**{¶ 57}** Ohio's multiple count statute is R.C. 2941.25, which provides:

**{¶ 58}** "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

**{¶ 59}** "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

**{¶ 60}** The Supreme Court of Ohio has recently held: "[w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, syllabus.

**{¶ 61}** Wright was convicted of count one, aggravated burglary, in violation of R.C. 2911.11, which provides, in part:

{¶ 62} "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

{¶ 63} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another[.]"

{¶ 64} Wright was convicted of count two, robbery, in violation of R.C. 2911.02, which provides, in part:

{¶ 65} "(A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:

{¶ 66} "***

{¶ 67} "(2) Inflict, attempt to inflict, or threaten to inflict physical harm on another[.]"

{¶ 68} Wright was convicted of count three, theft, in violation of R.C. 2913.02, which provides, in part:

{¶ 69} "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

{¶ 70} "(1) Without the consent of the owner or person authorized to give consent[.]"

{¶ 71} Initially, we will consider whether aggravated burglary and robbery are allied offenses of similar import.  In this matter, the evidence demonstrated that Wright trespassed into the Smiths' home in order to commit a theft offense.  Once inside the home, he

encountered Gene Smith and inflicted, as well as threatened to inflict, physical harm on her to further facilitate his commission of a theft offense. Wright's actions with regard to these offenses constituted a single course of conduct.

{¶ 72} It could be argued that Wright intended to enter the house only to steal property and that he committed a separate offense of robbery when he threatened Gene Smith. However, he was not charged and convicted of burglary, but aggravated burglary, which requires the infliction, or threatened infliction, of physical harm on another.

{¶ 73} This court recently decided the case of *State v. Bridgeman*, Champaign App. No. 2010 CA 16, 2011-Ohio-2680. In *Bridgeman*, the defendant was convicted of aggravated burglary, aggravated robbery, and grand theft as a result of a bank robbery. Id. at ¶1. In applying *State v. Johnson*, this court considered the defendant's conduct to determine whether the offenses were committed as part of a single act with a single state of mind. Id. at ¶53, quoting *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, at ¶49. In finding that the three offenses in question should be merged, this court held:

{¶ 74} "Under the facts of this case, it is apparent that the charges of aggravated robbery, aggravated burglary, and grand theft are allied offenses of similar import. The grand theft charge was based on the theft of $8,218; Bridgeman was not accused of stealing anything beyond the money from the bank. The aggravated robbery charge arose from Bridgeman's use of a deadly weapon in committing the grand theft. Bridgeman committed aggravated burglary by trespassing at the bank, by force and with a deadly weapon, while bank employees were present and with the purpose to commit grand theft and/or aggravated robbery. In short, all of the charges stem from Bridgeman's conduct of entering the bank to conduct a robbery,

threatening the employees with a firearm, demanding money, and leaving the bank with $8,218. Bridgeman committed multiple offenses through a single course of conduct and with a single state of mind." Id. at ¶54.

{¶ 75} The state asserts the instant matter is distinguishable from *Bridgeman*. While there are differences between this case and *Bridgeman*, they are immaterial and do not diminish the precedential value of that case as it pertains to the aggravated burglary and robbery convictions. In *Bridgeman*, the defendant committed aggravated burglary, in violation of R.C. 2911.11(A)(2), and aggravated robbery, in violation of R.C. 2911.01(A)(1), both predicated on the fact the defendant had a deadly weapon during the commission of the offenses. *State v. Bridgeman*, 2011-Ohio-2680, at ¶54. In this matter, Wright was convicted of aggravated burglary, in violation of R.C. 2911.11(A)(1), and robbery, in violation of R.C. 2911.02(A)(2), both predicated on the fact that he inflicted, attempted to inflict, or threatened to inflict physical harm on the victim while committing the offenses. While the elements of possessing a deadly weapon aligned the charges of aggravated burglary and aggravated robbery in *Bridgeman*, the elements of inflicting, attempting to inflict, or threatening to inflict physical harm aligned the charges of aggravated burglary and robbery in the case sub judice.

{¶ 76} The state asserts Wright committed aggravated burglary by trespassing into the Smiths' home with the intent to commit a theft offense and *caused* physical harm. In regard to the robbery conviction, the state argues Wright *threatened* to cause physical harm. In the indictment, as well as the jury instructions, both the offenses of aggravated burglary and robbery were based on alternative potential theories—that Wright (1) actually inflicted, (2) attempted to inflict, or (3) threatened to inflict physical harm on another. There was evidence

presented that Wright threatened to inflict and actually inflicted physical harm on Gene Smith. However, the jury did not make a specific finding as to which portion of the physical harm element they found for each offense. Accordingly, the record does not support the state's assertion that the jury based its finding for aggravated burglary on actual physical harm and its finding for robbery on threatened physical harm. There is an equally plausible explanation for the jury's verdicts—that the aggravated burglary and robbery convictions were both based on actual physical harm OR that the two offenses were both based on threatened physical harm. In either of these scenarios, the exact same conduct formed the basis for both convictions. If the state wished to pursue the case on this specific theory and avoid the possibility of the aggravated burglary and robbery convictions merging, it needed to specify in the indictment the specific conduct in relation to the physical harm element that each offense was predicated upon. Otherwise, in the absence of jury interrogatories on this issue, it is not possible to determine which conduct formed the basis of the jury's verdicts. To ask the trial court, or this court, to explore the record and make factual findings on this issue has the potential to violate a defendant's Sixth Amendment right to a jury trial.

{¶ 77} Based on the record before this court, Wright's convictions for aggravated burglary and robbery were based on the same conduct. Thus, these offenses are allied offenses of similar import and should be merged. See *State v. Johnson*, 2010-Ohio-6314, at syllabus, and *State v. Bridgeman*, 2011-Ohio-2680, at ¶54.

{¶ 78} In regard to the theft conviction, this offense was not committed as part of the same conduct as the aggravated burglary and robbery offenses. The offenses of aggravated burglary and robbery were complete at the time Gene Smith escaped from the residence. At

that time, the theft offense had not been completed, because Wright and Duke had not taken any of the Smiths' possessions from the home. Specifically, there was testimony presented that gems and jewelry were missing from the Smiths' upstairs bedroom. Since Gene Smith was in her upstairs bedroom when Wright and Duke entered the home, the evidence presented at trial creates a strong inference that the gems and jewelry were taken after Gene Smith escaped from the home. Accordingly, the theft offense was committed separately, at a different time than the aggravated burglary and robbery offenses, as well as in a different location, the upstairs bedroom versus the kitchen.

{¶ 79} The instant matter is distinguishable from this court's opinion in *State v. Bridgeman* on this point. In *Bridgeman*, the defendant entered the bank with the purpose to steal a specific item from the bank—cash. *State v. Bridgeman*, 2010-Ohio-2680, at ¶54. This court noted that "Bridgeman was not accused of stealing anything beyond the money from the bank." Id. In this case, the perpetrators took several different items (tools, gems, jewelry, cash, and a bomber jacket) from different places in the Smiths' home (the garage, an upstairs bedroom, and downstairs by the television). Moreover, they were randomly selecting items to steal as they went through the home, establishing an independent animus to commit the theft offense separately. Also, in *Bridgeman*, the robber entered the bank, demanded money, and left with the cash. Id. at ¶13. Thus, in that case, the theft offense occurred contemporaneously with the aggravated burglary and aggravated robbery offenses. Id. at ¶54. However, in this matter, there was a distinct, temporal break between the commission of the aggravated burglary and aggravated robbery offenses and the commission of the theft offense.

{¶ 80} In *State v. Johnson*, Justice O'Connor noted: "the state relied on the same

evidence to establish that Johnson's conduct – severely beating Milton and causing his death – violated both the child-endangering statute (R.C. 2919.22(B)(1)) and the felony-murder statute (R.C. 2903.02(B))." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, at ¶70 (O'Connor, J., concurring in judgment). In this matter, the state relied on Gene Smith's testimony to establish that Wright committed the offenses of aggravated burglary and robbery, but primarily relied on Sam Smith's testimony regarding the items taken from the home to establish that Wright committed theft.

**{¶ 81}** Based on the record before this court, Wright's conviction for theft was not based on the same conduct as his aggravated burglary and robbery convictions. Thus, the theft offense is not an allied offense of similar import to the aggravated burglary and robbery offenses, and it should not be merged with those offenses. See, e.g., *State v. Johnson*, 2010-Ohio-6314, syllabus, and *State v. Bridgeman*, 2011-Ohio-2680, at ¶54.

**{¶ 82}** This matter is remanded to the trial court in order for the trial court to merge the offenses of aggravated burglary and robbery. After merger, the state will have the opportunity to elect which of the offenses to pursue. *State v. Bridgeman*, 2011-Ohio-2680, at ¶56, citing *State v. Harris*, 122 Ohio St.3d 373, 2009-Ohio-3323, at ¶21-23 and *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, at ¶25. Moreover, while we order the offenses to merge and Wright to only be given a single sentence with respect to these two charges, the trial court "'should not vacate or dismiss the guilt determination.'" *State v. Bridgeman*, at ¶56, citing *State v. Whitfield*, at ¶26-27. After merger of the aggravated burglary and robbery offenses, the trial court should conduct a resentencing hearing and resentence Wright on the merged offense. See *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, paragraph one of

the syllabus.

{¶ 83} Wright's fourth assignment of error has merit.

{¶ 84} Wright's fifth assignment of error is:

{¶ 85} "THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING APPELLANT."

{¶ 86} As a result of our disposition of Wright's fourth assignment of error, we are remanding this matter to the trial court for merger of the offenses of aggravated burglary and robbery. Then, the trial court will need to resentence Wright on the merged offense. The Supreme Court of Ohio has held that "[a] defendant is not barred by res judicata from raising objections to issues that arise in a resentencing hearing, even if similar issues arose and were not objected to at the original sentencing hearing." *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, paragraph two of the syllabus. Thus, Wright will have the opportunity to raise objections to any perceived errors at the resentencing hearing on the merged count. Accordingly, Wright's fifth assignment of error is moot as it relates to the sentences imposed for the aggravated burglary and robbery convictions. See App.R. 12(A)(1)(c). However, the Supreme Court of Ohio has specifically rejected the sentencing-package doctrine. *State v. Saxon*, 109 Ohio St.3d 176, 2006-Ohio1245, paragraph two of the syllabus. We are affirming Wright's convictions for theft and aggravated menacing, and the convictions and sentences imposed for those offenses will not be disturbed. In addition, since the theft and aggravated menacing offenses are outside the scope of this court's remand, the trial court will not resentence Wright on those offenses, and Wright will not have another opportunity to raise objections relating to those sentences. See *State v. Wilson*, 129 Ohio St.3d 214,

2011-Ohio-2669, at ¶33. Thus, this assignment of error is not moot as it relates to those offenses.

{¶ 87} The Supreme Court of Ohio, in a plurality opinion, has recently held that felony sentences are to be reviewed under a two-step process. *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, at ¶26. The *Kalish* Court held:

{¶ 88} "First, [appellate courts] must examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law. If this first prong is satisfied, the trial court's decision in imposing the term of imprisonment is reviewed under the abuse-of-discretion standard." Id.

{¶ 89} Wright does not assert his sentence was contrary to law. Instead, he only challenges his sentence on the abuse-of-discretion prong of the *Kalish* test. Wright argues that the trial court abused its discretion by imposing an aggregate six-year prison term when a prison term of five years was discussed during a side-bar conference. Also, Wright argues the trial court abused its discretion by imposing consecutive sentences on counts one and two. Since these arguments pertain to the more severe sentences imposed for his aggravated burglary and robbery convictions, they are moot.

{¶ 90} The trial court imposed a one-year sentence for Wright's theft conviction and a 60-day sentence for his aggravated menacing conviction. In relation to these charges, the trial court found that Wright terrorized Gene Smith and that he stole from people who were trying to help him. Upon review of the record, we conclude that the trial court did not abuse its discretion by imposing these sentences.

**{¶ 91}** We note we are remanding this matter for resentencing on counts one and two after they are merged. Also, we note the record is not clear on whether the trial court ordered the 60-day sentence for aggravated menacing to be served consecutively or concurrently to the other sentences. On remand, the trial court should specify what its intention was regarding this issue.

**{¶ 92}** Wright's fifth assignment of error is moot as it relates to his aggravated burglary and robbery sentences and without merit as it relates to his theft and aggravated menacing sentences.

**{¶ 93}** The judgment of the Montgomery County Court of Common Pleas is affirmed in part and reversed in part. The trial court's judgment relating to Wright's convictions and sentences for theft and aggravated menacing is affirmed. The trial court's judgment relating to Wright's convictions and sentences for aggravated burglary and robbery is reversed. This matter is remanded to the trial court for further proceedings consistent with this opinion.

. . . . . . . . . . .

GRADY, P.J., and FROELICH, J., concur.

(Hon. Timothy P. Cannon, Eleventh District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Mathias H. Heck, Jr.
Johnna M. Shia
David R. Miles
Hon. Frances E. McGee